JAMES F. LEE et al., Appellants, v. THOMAS R. LEE et al., Appellees.

No. 40253.

June 23, 1930.

*Frantzen, Gilloon & Glenn,* for appellants.

*John G. Chalmers,* for appellees.

ALBERT, J.—Garnishment against Frank C. Stines was served on March 22, 1929. His answers were taken, in which he denied liability. In due time, these answers were controverted, and the matter tried out to the court, the trial resulting in the discharge of the garnishee. The fact situation out of which the errors relied upon for reversal are based, is as follows:

Thomas R. Lee and wife were the owners of two lots (31 and 32) in the William Blake Subdivision to the City of Dubuque. On March 20, 1929, they sold these lots, and deeded the same to Frank C. Stines, the sale price being $4,500. After deduction of a mortgage and other indebtedness owed by the Lees to Stines, there was a balance due the Lees of $1,500. At the time of the adjustment and the delivery of the deed, on March 20, 1929, a check for $1,500 was drawn on the Union Trust & Savings Bank of Dubuque, in favor of Lee and wife, and delivered to Mrs. Lee. It will be noticed that this was two days before the garnishment was served upon Stines. Roughly speaking, the determination of this case rests upon this check.

Stines, in answer to direct questions, testifies, in substance, that, when this check was delivered, he considered it a full settlement of the purchase price of these lots. In answer to a similar question, Thomas R. Lee testifies that he accepted the check as "payment for what the place was sold for." Bottomed on these answers, the argument is urged that, under the general rule, where a check is delivered with intention that it shall be payment of a debt, and it is also received by the other party as full payment, it amounts, in law, to full payment. It is argued, therefore, that, when the deed was delivered, full payment was made of the purchase price, and on March 20th, when

this settlement was made, full payment was made, and Stines was not, therefore, indebted to and did not owe the Lees anything at the time this garnishment was served, on March 22d.

If the record in the case sustains this contention, we assume the conclusion would necessarily follow; but, turning to the record itself, we find, among other evidence, the following:

Stines testifies that, at the time the deal was closed, on March 20th:

"I promised Tommy [Lee] to give him the cash when I dealt with him, and told Marian [Stines's daughter] to make out a check; and I told Tommy if he needed the cash, I would get it for him, and Tom said he didn't need the money until he went to Chicago."

As a matter of fact, Stines had no private account with the Union Trust & Savings Bank, upon which this check was drawn. He and his son constituted a partnership, doing business under the name "The Stines Baking Company," and it was in this name that the check was issued. Stines further testified:

"It was understood that I didn't have enough money in the bank so that I could cash that check. I told him [Lee] if he wanted the money, I would go down and get it for him; but he said he didn't need the money until he was leaving for Chicago, so that the money would be in time."

The check was never presented to the Union Trust & Savings Bank, on which it was drawn. Stines further said:

"I told him [Lee] I didn't have the money in the bank, but I said I would get the money for him, and he said there was no hurry."

On March 30th, Stines borrowed $3,000 in cash from the bank on his own note, and turned it over to his daughter, Marian. He further testifies:

"On the 30th or 31st of March, when Annie [Mrs. Thomas R. Lee] was going to Chicago, Marian told me that Annie wanted the money."

Stines in his prior testimony says:

"I said to him [Tommy], 'I haven't that much money in

the bank now, but I will go to the bank and get it for you,' "
and Tom said: "'Never mind, it will be time enough when
we are going to Chicago;' that they wouldn't need it until then.
That is the way it was left."

On cross-examination, he further said:

"Well, he [Lee] said it in this way: that he didn't need
the money until they would be ready to go to Chicago, and it
would be all right to give him the cash then."

Thomas R. Lee testified:

"The check was delivered to my wife for me. I left it
with her to get the money when she was ready to go to Chicago.
The money was to be borrowed at the bank by Mr. Stines. I
didn't know about cashing the check; I didn't want the money.
Well, he [Stines] told me at the time that he was going to bor-
row the money; that he didn't have that much money in the
bank. He told me he was going to borrow it, and any time I
wanted it, I could get it *from him,* when I was ready to leave
for Chicago."

Marian Stines testifies that she is the daughter of the gar-
nishee, and wrote the checks for the Stines Baking Company;
that she wrote a check payable to Thomas R. Lee on March 20,
1929, on a blank check taken from the back of the check book,
out of its regular order; that there wasn't $1,500 on deposit
in the bank, to cover the check. She said:

"I delivered it to Mrs. Thomas Lee on March 20th. My
father told me to make it out and deliver it to her. I cashed
this check on March 30th, out of currency handed me by my
father. He went to the bank and got it.

"Q. Under whose directions were you cashing that on that
day? A. Why, it was understood at the time being, when I
gave them the check. We told them we would cash it when-
ever they wanted the money, and they didn't want the money
until they were ready to go to Chicago. They didn't get the
money until the 30th. We were holding payment on the check
until that time, and *it was understood on the 20th, whenever
they wanted the money, they could come to us to get it.* I tore
the check up, after I gave her the money, because there was no
reason for keeping it. Thomas R. Lee was in Chicago at the

time, and the money was paid to Mrs. Lee. We told Tom that we didn't have that much money in the bank, but that, if he wanted it, we could get it for him. He said he didn't want the money until he was going to Chicago. Q. Was there anything said about him bringing the check back if he wanted the money? A. Why, naturally, he would have to bring the check back, to be cashed. Q. But that was the arrangement between you [the Stines] and Mrs. Lee? A. Yes. They [the Lees] didn't want to go down to the bank to cash the check.''

The question therefore is, under this testimony, showing the circumstances under which this check was issued, whether or not it was delivered and intended as a negotiable instrument; or whether, in fact, it evidenced only an indebtedness which was to be paid in the future; or, to put it in another way, whether or not this check was issued for the purpose of giving effect thereto as a negotiable instrument. Again, did the delivery of the check constitute full payment of the purchase of the property?

A careful reading of the part of the evidence set out, together with the other evidence in the case, satisfies us that the delivery of this check did not constitute full payment and satisfaction of the balance due on the purchase price. A little side light is thrown on this matter by the evidence, which shows that the bank on which this check was drawn, held two unsatisfied judgments against the Lees, which presents an additional reason why they would not wish to present this check to the bank on which it was drawn. But we are satisfied that no one can read this record and reach any other conclusion than that Stines believed he still owed the Lees, and expected to borrow this money from the bank and pay it to them in the future; that Lee, on his part, believed that Stines still owed him $1,500, which he expected to call upon him to pay in the future. Stines's daughter's testimony corroborates this; because it, in substance, amounts to a statement that it was understood, at the time the check was issued, that there was no money in the bank to pay it, and that her father would have to borrow the money at the bank, and that the check was to be returned to him for payment.

Section 9476, Code, 1927, provides, *inter alia*:

''Every contract on a negotiable instrument is incomplete

and revocable until delivery of the instrument for the purpose of giving effect thereto. As between immediate parties, * * * the delivery, in order to be effectual, must be made either by or under the authority of the party making, * * * as the case may be; and in such case the delivery may be shown to have been conditional or for a special purpose only, and not for the purpose of transferring the property in the instrument."

Under this section of the Negotiable Instrument Law it is apparent that this was an incomplete instrument, and was not delivered for the purpose of transferring the property in the instrument. No other conclusion could be drawn from the testimony in the case. It must follow, therefore, that the court erred in releasing this garnishment.

Quite a vigorous argument is made on the question of whether or not, in fact, such check ever existed; but, for the purposes of this opinion, we will assume that the check did exist, as claimed.

For the error herein pointed out, the decision of the district court is—*Reversed*.

MORLING, C. J., and STEVENS, FAVILLE, and WAGNER, JJ., concur.